## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA,
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **DANIEL KYLE THOMAS, an individual,** | ▪ | |
| | ▪ | |
| | ▪ | |
| **Plaintiff,** | ▪ | |
| | ▪ | |
| **vs.** | ▪ | **CIVIL ACTION NO:** |
| | ▪ | |
| | ▪ | **3:05-cv-00506-IPJ** |
| **WALKER COUNTY BOARD OF COMMISSIONERS, a county commission; JOHN MARK TIREY, an individual; WILLIAM LEE SMITH, an individual; and TRENT McCLUSKEY, an individual; ALVIN M. COLLINS, an individual;** | ▪ | |
| **Defendants.** | | |

### PLAINTIFF'S MEMORADUM BRIEF IN OPPOSITION TO THE DEFENDANT'S, ALVIN COLLINS, MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Daniel Kyle Thomas, and pursuant to Rule 56 of

the Federal Rules of Civil Procedure, submits his Memorandum Brief and Evidentiary

Material in support of his opposition to the Defendant's, Alvin Collins, Motion for

Summary Judgment.

## **INTRODUCTION**

The Plaintiff=s mother, Constance Health, filed a complaint on November 17, 2005, against the Defendant, Alvin Collins, pursuant to 42 U.S.C. ▪ 1983 and 1988 for violations of the Plaintiff=s minor son=s, Daniel Kyle Thomas, rights under the Fourteenth Amendment to the United States Constitution as well as violations of state law. The Plaintiff subsequently, after he turned 19, amended his complaint and substituted himself as a party plaintiff. Still pending before this Court are the Plaintiff=s allegations against the Defendant Collins=individual capacity actions related to the Plaintiff=s incarceration at Walker County Jail between January 30 and February 9, 2004. In general, the allegations are that Collins showed deliberate indifference in placing Thomas, a minor, at 16 years of age, when the incident occurred, into a cell or allowing him to remain in a cell with an adult male knowing that Thomas=placement in a cell with an adult male was a violation of the jail=s operating policies and procedures and a violation of Thomas=constitutional rights.

## **PLAINTIFF=S RESPONSE TO COLLINS=**
## **STATEMENT OF UNDISPUTED FACTS**

7. Disputed. Thomas does not know the identity of the jail officer who placed Smith into the cell with him initially. (Collins Exhibit A, pg. 89, line 21-pg.

90, line 4).  Therefore, Thomas cannot agree that Collins did not put Smith into the cell with him initially.

9.      Disputed.  Thomas had asked to be moved out of the cell with Smith some two days before the alleged incident because Smith started acting funny and had asked Thomas to massage his back for a trade.  (Exhibit U, Taped Interview of Thomas, February 11, 2004, pg. 2).


## PLAINTIFF=S ADDITIONAL UNDISPUTED FACTS

1.      Alvin Collins was notified by the Alabama Department of Conservation & Natural Resources in April 1991 that he had been recommended for a dismissal from employment due to misconduct.  (Exhibit D, State of Alabama Department of Conservation & Natural Resources v. State Personnel Board, 637 So.2d 894, 895 (Ala. Civ. App. 1994)).

2.      An Alabama State Personnel Board hearing officer conducted a hearing regarding the charges against Collins and recommended that the State Personnel Board sustain Collins= termination by the Alabama Department of Conservation & Natural Resources.  (Exhibit D, <u>Id.</u>).

3.     In applying for a job with the Walker County Sheriff's Department as jailer, Collins met with McCluskey on a weekend, was hired the same day and went to the personnel board on Monday to fill out an application.  (Collins Exhibit C, pg. 25, line 4-pg. 28, line 22).

4.     If Tirey had known Collins had been dismissed for misconduct from the Alabama Department of Conservation & Natural Resources, he would not have hired Collins.  (Collins Exhibit E, Tirey depo., pg. 43, line 14-pg. 44, line 16).

5.     Tirey was unaware Collins had been charged with misconduct by the Alabama Department of Conservation & Natural Resources. (Exhibit E, Tirey depo., pg. 43, line 6-13).

6.     Collins was a jailer on the second shift and his supervisor was Lieutenant Woodley.  (Exhibit F, Woodley depo., pg. 44, line 3-6; Collins Exhibit C, pg. 30, line 19-23).

7.     Collins was aware Thomas was to be housed separate from adult prisoners while an inmate in the jail.  (Exhibit G, Responses to Plaintiff's Request for Admissions, No. 3, pg. 2).

8.      Collins was aware that persons under the age of 18 who had been adjudicated by the courts as adults were required to be housed separate from adult prisoners.  (Exhibit G, Responses to Plaintiff=s Request for Admissions, No. 1, pg. 1).

9.      McCluskey alleged Collins may have placed Thomas into a cell with Smith on or about February 9, 2004.  (Exhibit I, Defendants=Answers to the Plaintiff=s Interrogatories, No. 1, pg. 1).

10.      If Collins placed Thomas into the same cell with Smith, Collins was not acting within the scope of his employment as a jail officer.  (Collins Exhibit B, pg. 77, line 20-pg. 78, line 10).

11.      Collins had access to a key which would have allowed him to open Thomas=cell door.  (Collins Exhibit B, pg. 19, line 1-18).

12.      Collins could have taken a key, opened Thomas=cell door and moved him to another cell.  (Collins Exhibit B, pg. 38, line 6-23).

13.      As a result of the investigation by the Sheriff=s department, Tirey determined Collins had placed Thomas and Smith into the same cell.  (Exhibit E, Tirey depo., pg. 51, line 3-9).

14.     Investigator Bridges attempted to speak with Collins about the incident but Collins did not want to talk about the incident and had quit working at the jail. (Exhibit AA, Bridges depo., pg. 39, line 5-13).

15.     Sheriff Tirey had the hiring and firing authority for the jail.  (Collins Exhibit B, pg. 65, line 8-9).

16.     A consent order entered between the parties including the Walker County Commission, Sheriff and Jail Administrator required persons under 18 years of age charged or convicted as adults to be separated from adult inmates.  (Exhibit J, Consent Order, pg., 9, paragraph 35).

17.     On May 15, 2003, McCluskey issued a memorandum to all employees that residents of M Dorm were to be kept separated and, if an inmate was in protective custody, that inmate should be restricted from all contact with other residents. (Exhibit K, Memorandum with notation dated May 15, 2003).

18.     On May 6, 2003, McCluskey issued a memorandum to all jailers that residents of M Dorm were not to be allowed to mix with other inmates.  (Exhibit L, Memorandum dated May 6, 2003).

19.     On December 17, 2001, Sheriff Tirey and Administrator McCluskey issued a memorandum to all jail employees that minors were to be housed separately

from adults. All jail employees signed indicating receipt of the memorandum. (Exhibit M, Memorandum dated December 17, 2001, re: Housing Juveniles Separate From Adults).

20. Prior to February 2004, Sheriff Tirey had rented a classroom and conducted a class on policies and procedures for the jail with the entire jail staff. (Exhibit E, Tirey depo., pg. 60, line 11-20).

21. During shift briefings, the outgoing shift supervisor would review all memos, new policies or procedures and pass on the information from the previous shift as written in the **A**pass down log**@** or make any appropriate special announcements. (Exhibit N, Title 2.12, A(2), October 26, 1998).

22. A Classification policy existed noting that no juveniles will be housed with adult inmates at the jail. Juveniles would be housed in a separate housing area of the jail, juveniles may be housed with other juvenile inmates of the same sex and an observation log would be kept on all juveniles. (Exhibit O, Title 5.01, A(9), pg. 2, unsigned and undated).

23. Homosexual activity does occur in jails and prison. (Collins Exhibit C, pg. 88, line 18-21).

24.     There were other instances of homosexual activity at the jail.  (Exhibit Q, Armstrong depo., pg. 47, line 20-pg. 49, line3).

25.     In February 2004, there was everyday talk among the prisoners of homosexual activity.  (Exhibit Q, Armstrong depo., pg. 47, line 9-14).

26.     Prior to Thomas=alleged rape, there was another alleged rape at the jail. (Exhibit Q, Armstrong depo., pg. 41, line 13-18; Exhibit Z, Burton depo., pg. 39, line 23-pg. 40, line 10; Exhibit E, Tirey depo., pg. 35, line 18-pg. 36, line 6).

27.     The M Dorm stood for maximum security and housed alleged murderers, alleged sex offenders, minors, and those needing protective custody.  (Collins Exhibit C, pg. 48, line 4-16).

28.     Jail policies required that visual checks be made on regular intervals on all inmates.  (Collins Exhibit B, pg. 107, line 4-8).

29.     At the beginning of each shift, each jailer would have available a pass down log from the prior shift which would indicate events which occurred during the prior shift, transfers of inmates from one cell to another cell and the identity of any juveniles in M Dorm.  (Exhibit P, Steadman depo., pg. 16, line 10-pg. 17, line 16).

30.     The computer and booking sheet contained the age of each inmate. (Exhibit Q, Armstrong depo., pg. 26, line 3-7).

31.     Inmates escorted out of their cell in M Dorm were to be handcuffed and restraints applied.  (Exhibit R, Walker County Jail Post Orders, Maximum Housing Rover, June 1998).

32.     The movement of any prisoner from one cell to another in M Dorm required two officers be present after notifying central control of the move.  The movement was required to be logged on the observation log on the inmate's cell door.  (Collins Exhibit C, pg. 54, line 10-pg. 56, line 15; Exhibit S, Skalnik depo., pg. 18, line 1-6).

33.     The policy at the Jail was that juveniles would not be placed into a cell with adults even if the juvenile had been adjudicated as an adult.  (Collins Exhibit C, pg. 42, line 3-16).

34.     It was a policy that anytime a prisoner was moved within M dorm, the officer must log the move on the board in booking, in the computer, in the pass down log and on the observation log.  (Collins Exhibit B, pg. 20, line 23-pg. 21, line 22; Exhibit F, Woodley depo., pg. 52, line 19-pg. 53, line 14).

35.     Thomas was a pretrial detainee while he was an inmate at the jail in February 2004.  (Exhibit E, Tirey depo., pg. 94, line 11-13).

36.     Thomas was held in the booking area after his admission for at least 24

hours because he was a minor. (Collins Exhibit B, pg. 109, line 8-16).

37.     Thomas was a special security risk at the jail because of the harm that others might inflict on him. (Collins Exhibit B, pg. 109, line 17-20).

38.     McCluskey ordered that Thomas would remain in a cell by himself beginning with his admission on January 30, 2004.  (Collins Exhibit B, pg. 111, line 5-8).

39.     Thomas=first cell in M dorm was M 14 upstairs.  (Collins Exhibit A, pg. 49, line 22-23; pg. 91, line 7-15).

40.     Smith was moved into cell M 14 with Thomas.  (Collins Exhibit A, pg. 53, line 19-22; pg. 55, line 6-7; pg 91, line 7-10).

41.     Thomas does not remember the identity of the officer who moved Smith into the cell with him in M Dorm.  (Collins Exhibit A, pg. 89, line 21-pg. 90, line 4).

42.     The move wherein Thomas and Smith were moved into the same cell occurred on the second shift.  (Exhibit U, Taped Interview of Thomas, February 11, 2004, pg. 1).

43.     Thomas was in the cell with Smith on the second floor of M Dorm (M 14) for two to three days prior to the move downstairs (to M 3).  (Collins Exhibit A, pg. 64, line 5-12; pg. 90, line 14-pg. 91, line 15).

44.     Collins moved Thomas and Smith from upstairs in M 14 to downstairs M 3. (Collins Exhibit A, pg. 48, line 7-17; pg. 49, line 21-pg. 50, line 2; pg. 53, line 16-22; pg. 14, line 11-13; pg. 55, line 8-18; pg. 57, line 13-16; pg. 61, line 5-11; pg. 62, line 3-12; pg. 63, line 3-21).

45.     Thomas was in the cell with Smith for about a week or two in M Dorm in cell M3 prior to the alleged incident on February 9, 2004.  (Exhibit U, Taped Interview of Thomas, February 11, 2004, pg. 1; Collins Exhibit A, pg. 57, line 19-21).

46.     About two days before the alleged assault, Thomas asked to be moved out of the cell with Smith into the cell with a friend because Smith had started acting funny and had asked him to massage his back for a trade.  (Exhibit U, Taped Interview of Thomas, February 11, 2004, pg. 2).

47.     Thomas was in cell M3 on February 9, 2004, when the alleged rape occurred.  (Exhibit T, Taped Interview of Thomas, February 9, 2004, pg. 1).

48.     The cell in which Thomas was located at the time of the alleged incident with Smith had a small window and tray hole.  (Collins Exhibit A, pg. 66, line 7-10).

49.     Smith was approximately 6'2" and weighed approximately 175 to 180 pounds.  (Collins Exhibit B, pg. 73, line 11-15).

50. Smith had been a prisoner at the jail off and on since 1995 for property crimes. (Collins Exhibit B, pg. 72, line 12-18).

51. Any of the jailers who looked into Thomas= cell would have known Thomas was a minor. (Collins Exhibit B, pg. 79, line 1-pg. 80 line 5).

52. It was common knowledge by all of the officers at the jail that Thomas was a minor. (Collins Exhibit B, pg. 25, line 16-18; pg. 44, line 9-19).

53. There were not a lot of juveniles in the jail in February 2004 and it was widely known who was a juvenile. (Exhibit V, Robinson depo., pg. 20, line 10-23).

54. If an officer on Woodley=s second shift looked into a cell and saw Smith and Thomas, each officer should have known Thomas should not be in the cell with Smith. (Exhibit F, Woodley depo., pg. 89, line 4-19).

55. Thomas was lying on his abdomen on his bunk when Smith approached him from the back and held a razor to his throat and told him to be still. Smith pulled down Thomas= uniform and penetrated him with his penis into his rectum for about three or four minutes and ejaculated into a towel and shorts. (Exhibit X, Gold Nurses Note, February 9, 2004, pg. 1).

56.     After the incident of alleged rape and after the penetration, Smith wiped himself off with a towel that was hanging over Thomas=bed.  (Exhibit T, Taped Interview of Thomas, February 9, 2004, pg. 6).

57.     Jailers were first summoned to Thomas=cell on February 9, 2004, at 7:05 p.m. regarding an incident.  (Exhibit P, Steadman depo., pg. 44, line 1-pg. 45, line 9).

58.     Thomas advised nurse Gold within an hour of the alleged incident that Smith had penetrated him with his penis into his rectum and ejaculated in a towel and shorts.  (Exhibit X, Gold Nurses Note, February 9, 2004, pg. 1; Exhibit W, Gold depo., pg. 23, line 4-12).

59.     Nurse Gold=s examination of Thomas=rectal area consisted of an officer shining a flashlight after Thomas spread his cheeks and without touching Thomas. (Exhibit W, Gold depo., pg. 29, line 6-10).

60.     In order for Thomas to insert an object into his anus resulting in a tear, he would have to use some force and he would experience pain.  (Exhibit Y, Dr. Sperry depo., pg. 72, line 9-23).

61.     The rectal tear or laceration in Thomas was caused by a forced anal penetration with resistance.  (Exhibit Y, Dr. Sperry depo., pg. 29, line 3-pg. 30, line 2).

62.     A physician diagnosed a rectal laceration or tear.  (Exhibit BB, Medical Records, pg. 3).

63.     On February 9, 2004, Thomas suffered a 1.5 cm tear at the 11:00 position of his rectum with a small amount of bleeding.  (Exhibit BB, Medical Records, pg. 3).

64.     Thomas was interviewed by Investigator Bridges regarding the incident at the jail beginning at 8:31 p.m. on February 9, 2004, and again on February 11, 2004. (Exhibits T & U, Taped Interviews of February 9 and 11, 2004, pg. 1).

65.     The inmate observation logs of January 30 and February 1, 2, 3, 6, 7 and 9, 2004, produced by the Defendants, Tirey and McCluskey, do not reveal any movement of Thomas from one cell to another.  (Exhibit H, Inmate Observation Logs, January 30 and February 1, 2, 3, 6, 7and 9, 2004); (Collins Exhibit B, pg. 17, line 12-17).

## ARGUMENT

## SUMMARY JUDGMENT STANDARD

Under the facts of this case, summary judgment is not appropriate because there are genuine issues as to material facts and Collins is not entitled to judgment as a

matter of law. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted where the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits show there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c). The facts of a dispute are genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). The fact is material if it might affect the outcome of the suit. Id. What is considered to be facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial but those are the facts of the proceeding for summary judgment purposes. Cottrell v. Caldwell, 85 F.3d 1480, 1486 (11th Cir. 1996). Summary judgment is only proper if a jury, when reviewing all the facts and any reasonable inferences therefrom in a light most favorable to the plaintiff, could not reasonably return a verdict in the plaintiff=s favor. Anderson, supra 477 U.S. The basic issue before this Court on a motion for summary judgment is whether the evidence presented shows a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Anderson, supra 477 U.S. at 251-252.

## I.  DEFENDANT COLLINS FAILED TO PROTECT THE PLAINTIFF DURING THE PLAINTIFF=S INCARCERATION AT THE WALKER COUNTY JAIL

Although the Plaintiff=s claim is brought under the Due Process Clause of the Fourteenth Amendment, the minimum standard of care which is owned to a pretrial detainee such as Thomas under the Fourteenth Amendment is the same as the minimum standard of care under the Eighth Amendment.  Belcher v. Foley, 30 F.3d 1390, 1396 (11th Cir. 1994).  From the time Thomas was incarcerated at Walker County Jail, he was a pretrial detainee and his claims must be considered under the Due Process Clause of the Fourteenth Amendment and Thomas must not be punished at all prior to a lawful conviction.  Bell v. Wolfish, 441 U.S. 520, 575 & n.16 (1979).

The Consent Order in Randy Terrell, etc. v. Tommy Herring, etc., in the United States District Court, Northern District of Alabama, Jasper Division, entered in 1994 is relevant to Thomas=status and responsibilities of Collins.  At the time the Consent Order was entered between Walker County, Alabama, the Walker County Commission, the Walker County Sheriff, and the Walker County Chief Jailer, the Consent Order noted that persons under 18 years of age who were charged or convicted as adults shall be separated from other inmates when their age or physical immaturity exposes them to risk of harm.  (Exhibit J, Consent Order, pg. 9).  The

Terrell defendants including the Sheriff and Chief Jailer acknowledged they would require strict compliance with the Consent Order from all of their employees and successors. (Id. at 24). The Consent Order further acknowledged that it applied to prisoners in the future who might be confined in the Walker County Jail. (Id. at 3).

In order to be successful, Thomas must show that Collins was deliberately indifferent and there was a substantial risk of serious harm at the time Thomas was incarcerated at the jail. Thomas is required to show that Collins subjectively knew of the substantial risk of a serious harm including rape and that Collins knowingly or recklessly disregarded the risk by failing to take reasonable measures to prevent it. Hale v. Tallapoosa County, 50 F.3d, 1579, 1583 (11th Cir. 1995) (citing Farmer v. Brennan, 511 U.S. 825 (1994)). Whether a jailer or prison official has the requisite knowledge of a substantial risk is a question of acts subject to demonstration in the normal manner including an inference from circumstantial evidence. A fact finder may conclude that a jailer or prison official knew of a substantial risk from the very fact the risk was obvious. Hale, supra at 1583 (citing Farmer, supra). Thomas=failure to give advanced notice of an attack is not dispositive of the matter. An official may not escape liability by showing that he did not know the inmate was likely to be assaulted or that an assault would be committed by a specific prisoner. Id. A casual

connection must also be established by the plaintiff by proving the jail official was personally involved in an accident which resulted in a violation of the plaintiff=s due process rights. Ancata v. Prison Health Services, Inc., 769 F.2d 700, 706 (11th Cir. 1985).

Whether a jail official such as Collins has knowledge of a risk is a question of fact subject to demonstration in the normal manner and the court, as a fact finder, may conclude that the official knew of a substantial risk from the very fact that such a risk was obvious. Farmer v. Brennan, 511 U.S. 825, 842-43 (1994). Nothing is more obvious than Collins knew at the time of Thomas=pretrial detention that homosexual rape was common in prison. He also knew rape was more likely where there was a difference in age, namely, an adult in the same cell with a minor as well as increased risk where one individual was stronger, calloused or more prison refined. In Farmer, Justice Blackmon, in a concurring opinion, noted that a prison rape threatened not only the lives of those who fall prey and was potentially devastating to the human spirit. Justice Blackmon also noted that a person might be unable to defend himself without the protection of prison officials and might find himself at the mercy of a larger, stronger and more ruthless inmate. Id. at 853.

In this case, Collins had subjective knowledge that homosexual rape was a problem in the prison. He testified that he knew homosexual rape existed in jails and prisons. (Collins Exhibit C, pg. 88, line 9-21). Collins stated he would not want to place a sixteen year old into a cell with an adult because the minor would probably be molested. (Id. at pg. 89, line 22-pg. 90, line 9). Often, adult prisoners are bigger, stronger and more influential than minors. Homosexual talk occurred everyday in the Walker County Jail. (Exhibit Q, Armstrong depo., pg. 47, line 9-14). There was at least one prior instance of homosexual rape reported at the Jail before the incident involving Smith and Thomas. (Exhibit Q, pg. 41, line 13-18; Exhibit Z, Burton depo., pg. 39, line 23-pg. 40, line 6). Sheriff Tirey and jail administrator McCluskey had discussed the reasons for adherence to the <u>Terrell</u> Consent Order of 1995 with the jailers. Every week when Collins read the newspaper, looked at television, or went to work, he was knowledgeable about the jail system in which stronger and more knowledgeable prisoners took advantage of minors. Collins had attended meetings conducted by the Sheriff regarding the policies and procedures in the jail. (Exhibit E, Tirey depo., pg. 60, line 11-20). He had received memos from Tirey regarding policies related to M Dorm. (Exhibits K, L, & M).

Collins knew minors were to be kept by themselves and normally kept in either booking, the infirmary or as a last resort, M Dorm. (Exhibit F, Woodley depo., pg. 40, line 14-20; Exhibit Z, pg. 25, line 6-pg. 26, line 6). Collins worked on Lieutenant Woodley=s second shift. (Exhibit F, pg. 44, line 3-6; Collins Exhibit C, pg. 30, line 19-23). Everyone on Woodley=s shift were aware Thomas was a minor and should be left in a cell by himself. (Exhibit F, pg. 89, line 4-19). Although Collins tries to distinguish the fact that he only moved Thomas from one cell to another within M Dorm, that does not excuse his actions. Collins would have been required by the policies and procedures to inform central control that he was moving both Smith and Thomas, log the movement into the computer, log the move on Smith and Thomas== inmate observation logs and provide the information regarding the move in the pass down log to the next shift in M Dorm. (Collins Exhibit B, pg. 20, line 20, line 23; pg. 21, line 22; Exhibit F, pg. 52, line 19-pg. 53, line 14; Collins Exhibit C, pg. 74, line 4-10).

There was no requirement that Thomas was to provide Collins with any warning regarding any difficulty he was having with Smith. All Collins had to do was adhere to the policies and procedures which would have required him to look on the cell door where he would have determined Thomas was to remain in a cell by himself.

Jail Administrator McCluskey had required, when Thomas first arrived in booking, that Thomas be placed in a cell by himself with a warning that he was a minor and was to stay by himself.  (Collins Exhibit B, pg. 111, line 5-8).  Tirey acknowledged there was a warning posted on Thomas=cell door that he was to stay by himself.  (Exhibit E, pg. 68, line 8-13).  Thomas testified that Collins moved he and Smith from M 14 downstairs to M 3.  Two officers were required to move inmates.  (Exhibit S, Skalnik depo., pg. 18, line 4-6).  Only Collins moved Smith and Thomas.  (Collins Exhibit A, pg. 48, line 11-17).  Collins had access to a key whereby he could move Thomas and Smith without alerting central control.  (Collins Exhibit B, pg. 38, line 6-23).

## II.  DEFENDANT COLLINS HAD SUBJECTIVE AWARENESS OF A SUBSTANTIAL RISK TO THOMAS AND DISPLAYED DELIBERATE INDIFFERENCE TO THE RISK

There were numerous safeguards, according to Defendants Tirey and McCluskey, that were set forth to preclude Thomas from being placed into a cell with an adult prisoner.  Collins affirmed subjective knowledge of the fact that rape or molestation of a minor would probably occur if a minor were placed into a cell with an adult.  Collins was aware of the other safeguards put into place by the Sheriff and the Chief Jailer to prevent such events from occurring.  In looking at the evidence in

light most favorable to the Plaintiff, there is substantial evidence there was a warning on Thomas=cell door indicating he was a minor. Everyone in the jail knew Thomas was a minor. His age was in the computer, booking information and pass down log. The pass down log would have contained information regarding Thomas=status as a juvenile and his movement during the prior shift. Collins has no recollection of Thomas at all. He is not able to dispute that he, in fact, did place Thomas and Smith in the same cell. Thomas testified that Collins moved him and Smith from one cell to another cell. Thomas did not testify there was another individual with Collins. The requirements at the jail, in moving inmates within M Dorm, required two officers present who would ask central control to open the cell. Collins would also have to tell central control the names of the individuals he was moving and their location and then central control would log that information into their log. That information would then be placed by him in the pass down log for the next shift. Additionally, Collins would also be required to make the change in the computer as to Thomas=location and on the inmate observation log. (Collins Exhibit C, pg. 54, line 10-pg. 56, line 15). None of this was done. None of the records reveal any movement of Thomas while he was a pre-trial detainee in the Jail. (Exhibit H; Collins Exhibit B, pg. 17, line 12-17).

## CONCLUSION

As a result of Collins≠ deliberate indifference to Thomas≠ risks, he was raped by Smith, an adult male, who shared the same cell with him. Collins was aware of a substantial risk that a minor such as Thomas would be raped by an adult inmate. Collins was aware of a policy requiring minors to remain in a cell by themselves. Collins exhibited deliberate indifference to those risks and as a result, Thomas was raped by an adult inmate on February 9, 2004.

**s/ Ronald R. Crook**
Ronald R. Crook
Bar No: ASB-7310-R55R
Attorney for Plaintiff
SMITH & ALSPAUGH, P.C.
505 20th Street North, Suite 1100
Birmingham, AL 35203
Telephone: 205-324-8910
Fax: 205-324-8929
E-mail: rcrook@smithalspaugh.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on _____ filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Darrell L. Masters, Esq.
C. Richard Hill, Jr., Esq.
WEBB & ELEY, P.C.
P.O. Box 240909
Montgomery, AL 36124

Kristi A. Dowdy, Esq.
McDONALD & DOWDY
1005 Montgomery Highway
Birmingham, AL  35216

I further certify that I currently hold the original signature document with all the formalities.

I further certify that I have served a copy of the above upon the following Defendant of record by U.S. Mail, postage prepaid and properly addressed on this the 14th day of August, 2006:

Lee Andrew Smith
AIS No. 1142192
Limestone Correctional Facility
28779 Nick David Road
Harvest, AL  35749

Respectfully submitted,

/s Ronald R. Crook
Ronald R. Crook
SMITH & ALSPAUGH, P.C.
505 20th Street North, Suite 1100
Birmingham, AL 35203
Telephone: 205-324-8910
Fax: 205-324-8929
E-mail: rcrook@smithalspaugh.com
Bar No: ASB-7310-R55R